IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CARLOS A. L. VAUGHN,                §
           PETITIONER,       §
                                 §
V.                                  §
                                 §        No. 3:03-CV-906-K
DOUGLAS DRETKE, Director,           §
Texas Department of Criminal Justice, §
Correctional Institutions Division,  §
           RESPONDENT.       §
                                 §

## REPORT AND RECOMMENDATION
## TO DENY PETITION FOR WRIT OF HABEAS CORPUS

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the United States District Court for the Northern District of Texas, this case has been referred to the United States Magistrate Judge. The findings, conclusions and recommendation of the Magistrate Judge are as follows:

## I.
## NATURE OF THE CASE

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28, United States Code, Section 2254.

## II.
## PARTIES

Petitioner, Carlos A. L. Vaughn ("Petitioner" and "Vaughn"), is an inmate in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). Respondent, Douglas Dretke, is the Director of TDCJ-CID.

### III.
### PROCEDURAL HISTORY

A jury convicted Petitioner of capital murder, and his punishment was assessed at life incarceration in the Texas Department of Criminal Justice, Correctional Institutions Division. *State v. Vaughn*, No. F97-02801-TK (Crim. Dist. Ct. No. 4, Dallas County, Tex. Oct. 2, 1997). The case was appealed to the Texas Court of Appeals for the Fifth District of Texas at Dallas, which affirmed the conviction and death sentence. *Vaughn v. State*, No. 05-97-01962-CR, 2000 WL 688249 (Tex. App.–Dallas 2000, pet. ref'd)(unpublished). Vaughn's petition for discretionary review was refused by the Texas Court of Criminal Appeals on April 11, 2001. In the meantime, Vaughn filed a state application for writ of habeas corpus on October 5, 2001. (St. Hab. Tr. at 2.) The trial court received evidence and entered findings of fact and conclusions of law recommending that relief be denied. *Ex parte Vaughn*, No. W97-02801-K(A) (Crim. Dist. Ct. No. 4, Dallas County, Tex. July 15, 2002); (St. Hab. T. at 145-154.) The Court of Criminal Appeals denied relief without a written order on September 11, 2002. (St. Hab. Tr. at cover)

Petitioner filed his federal petition for writ of habeas corpus on April 29, 2003. Respondent filed an answer with brief in support on October 20, 2003, and furnished the state court records.

### IV.
### EXHAUSTION

In his answer to the original petition, Respondent alleges that claims raised in the petition are unexhausted. However, he does not request that any of those claims be dismissed on exhaustion grounds. (Ans. at 8-9.) Instead, he claims that such claims should be denied. Since each of Petitioner's claims lack merit, they may be denied notwithstanding any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2).

2

## V.
## ISSUES

In five claims for relief, Petitioner complains (1) that the statute upon which his conviction is based is unconstitutionally vague or overbroad (*See* Petitioner's Second Amended Memorandum of Law and Fact, hereinafter "Pet.", at 1-17), (2) that there is insufficient evidence to support Petitioner's conviction for capital murder (*See id.* at 17-35), (3) that he was denied the effective assistance of counsel at his trial counsel (*See id.* at 35-45), (4) that he was denied the effective assistance of counsel in his direct appeal (*See id.* at 45-48), and (5) that the trial court violated Petitioner's due process rights by denying his motion for a new trial after admitting that there was not enough evidence to convict him. (*See id.* at 48-49.)  For the reasons set out below, these claims should be denied.

## VI.
## STANDARD OF REVIEW.

The standard of review in federal habeas proceedings is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), which provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

3

Since the petition in this case was filed after April 24, 1996, the above-cited provision of the AEDPA applies to those claims which were adjudicated on the merits. *Lindh v. Murphy*, 521 U.S. 320, 326-27, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). "Resolution on the merits" in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

Section 2254(d)(2) concerns questions of fact. *See Moore v. Johnson*, 225 F.3d 495, 501, 504 (5th Cir. 2000). The resolution of a factual issue by a state court is presumptively correct and will not be disturbed unless the prisoner rebuts the presumption by clear and convincing evidence. *See, id.*; 28 U.S.C. § 2254(e)(1). Under § 2254(d)(2), a state court's ultimate decision based upon those factual determinations "will not be overturned on factual grounds unless objectively unreasonable

4

in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

## VII.
## FACTUAL BACKGROUND.

Petitioner was convicted of the capital murder of Rachelle Morman, who Vaughn had dated and asked to marry him. *Vaughn v. State*, 2000 WL 688249 at *3 (Tex. App.–Dallas 2000, pet. ref'd). Vaughn's family did not know of such marriage plans.[1] Morman's mother testified that she last heard from Morman about 12:15 A.M. on December 17, 1995, when Morman called to say that she was closing the Pizza Inn where she worked as an assistant manager, and would be coming home. *Id.* at *3. During this conversation, Morman received another call on her phone. *Id.* Her mother asked who was on the other line, but Morman did not say. *Id.* Morman closed the Pizza In at about 12:45 A.M. and gave a coworker a one-block ride home. *Id.* at *4. Morman was supposed to bring the restaurant money, about two thousand dollars, home and deliver it to the manager of the Pizza Inn in the morning, but never arrived at either location. *Id.* at *3-4.

Vaughn worked at Church's Chicken, where Morman picked him up about 1:15 A.M. that morning. *Id.* at *4, 6. Vaughn never returned to work. *Id.* Instead, he spent the next week gambling in Louisiana with money from an unknown source.[2] Morman was found dead in her blue car on

---

[1] Jana Ooley, the fiancé to Vaughn's brother, testified that although she talked with Vaughn often, he never mentioned anything about marrying Morman, but instead talked about marrying Dana Sanders. *Id.* at *5. Vaughn's mother testified that although she had met Morman two or three times, she did not know that Vaughn and Morman planned to get married and was surprised by such plans. *Id.* at *7.

[2] The week after Morman's body was found, Vaughn went to Louisiana and used the name of his brother, Derrick Johnson, to gamble. *Id.* at *4. The evidence also showed that on December 21, 1995 at one of these casino's a person named "Derrick Johnson" attempted to become a rated player and lost $500 in three hours and 45 minutes. *Id.* at *7. Vaughn's brother, Derrick Johnson, had never gone to the casino. *Id.* at *5. Vaughn lived with his mother, who testified that he did not have much income, and that she did not know where he got money to gamble. *Id.* at *7.

December 18, 1995, in a high crime area, along with a bag with Pizza Inn receipts and other papers in the car, but no money or a purse.  She had been stabbed to death.  *Id.* at *1-3.

Later that morning, Vaughn called Morman's home and spoke with her mother, who thought Morman had stayed with Vaughn instead of coming home.  *See id.* at *3.  He asked for Morman, and denied having seen her that night.  *See id.*  Morman's mother called the police and then searched for Morman.  *See id.*  She spoke with one of Vaughn's neighbors who said that a lady in a blue car had picked up Vaughn.  *See id.*  When Vaughn called her later than day, she confronted Vaughn, saying "I thought you hadn't seen Rachelle."  *Id.*  Vaughn paused, then told her than it was his sister-in-law that had picked him up and he had not seen Morman.  *See id.*

Vaughn had already called his brother's fiancé, Jana Ooley, at about 3:00 A.M. on Sunday, December 17, 1995, and told her to say she picked him up if anybody asked.  *See id.* at *5.  Vaughn called Ooley again late that afternoon and asked her if she knew anybody with a blue car.  *See id.*  Ooley said no, but told Vaughn that her sister previously drove a blue truck.  *See id.*  Vaughn said that it had to be a blue car like Morman's, and hung up.  *See id.*  Vaughn called again that evening, again wanting to know if Ooley knew anybody with a blue car.  *See id.*  Ooley said she knew someone named Larry who had a blue car, but the car did not look like Morman's.  *See id.*  Vaughn told Ooley to tell the police that she picked him up in Larry's car around 1:05 to 1:10 A.M., drove Vaughn to her house, and sat and talked with Vaughn until around 3:00 or 3:30 A.M.  *See id.*  Vaughn used this story with the police, even though Ooley ended up telling the truth.  *See id.* at *5-6.

Ooley eventually found out that Morman had been murdered.  *See id.*  She talked with Vaughn on Christmas night, and he told her that the police were looking for him because Morman had taken out a life insurance policy leaving him $200,000.  *See id.*  Vaughn said he did not know about the

policy, but that he had been the last person to see her alive and that was why he needed Ooley to lie. *Id.*

About 10 days before the murder, Vaughn called an insurance salesman about obtaining life insurance for himself and Morman and they discussed amounts. *See id.* at *6. About a week later, Vaughn again called and said that he wanted to obtain a $200,000 life insurance policy that day, but no health insurance. *See id.* Vaughn and Morman then completed applications for a $200,000 policy on Morman with Vaughn as the sole beneficiary. *See id.* On December 19, 1995, Vaughn again called the salesman to report the death claim. *See id.* After litigation to determine who should get the life insurance proceeds, Vaughn received a settlement of about $37,600. *See id.* at *6. The remainder went to Morman's mother and son. *See id.* Vaughn did not say anything about the insurance policy to the police until questioned about it, to which he responded that he told the insurance man he did not want to be the beneficiary. *See id.* at *6.

The pathologist testified that Morman died of multiple sharp force injuries. (3 RR at 92-93.) These included a stab wound to her chest penetrating the sac of her heart, one to her back penetrating to the bone of the spine, and one to her neck, penetrating into the spine and also capable of causing paralysis. (3 RR at 90-92.) Her throat was also cut from the front to the left side, and she had several cuts on her hands, characterized as defensive wounds. (3 RR at 84, 87-88.) A strand of hair was found in Mormon's left hand which matched the medical examiner's agent that worked the scene of the crime. *Vaughn*, 2000 WL 688249 at *4. Two more hair fragments were recovered from the vehicle, which was also Caucasian and did not match Morman, Vaughn or any person tested. *See id.* All of the blood stains in the vehicle matched Morman. *See id.* Although Vaughn's boot had a spot that appeared to be blood but could not be determined human at all, *see id.,* and his jacket also tested

presumptively positive for traces of blood, *see id.*, none of Morman's blood was proven to have been found on Vaughn.  *See id.* at *7.  Finally, although Vaughn appeared to cooperate with the police, the Church's Chicken work shirt that he was wearing that night was never located.  *See id.* at *6.

## VIII.
## EXAMINATION OF THE ISSUES.

### A.  *Vague penal statue.*

In his first claim for relief, Petitioner contends that the penal statute forming the basis of his conviction is unconstitutionally vague.  Specifically, Vaughn attacks Section 19.03(c) of the Texas Penal Code, the statute under which he was prosecuted for capital murder, wherein it proscribes murder for remuneration or the promise of remuneration.  For the reasons set forth below, this claim should be denied.

Vaughn takes issue with the interpretation of "remuneration" that the Texas courts have given this statute at least since it decided *Beets v. State*, 767 S.W.2d 711, 737 (Tex.Crim.App. 1987).  However, federal courts in post-conviction habeas corpus proceedings do not sit to review questions of state law.  *See Engle v. Isaac*, 456 U.S. 107, 119-21, 102 S.Ct. 1558, 1567-68, 71 L.Ed.2d 783 (1982)("While they attempt to cast their first claim in constitutional terms, we believe that this claim does no more than suggest that the instructions at respondents' trials may have violated state law"); *see also Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000)(referring to "the long- standing principle that federal courts do not sit to review questions of state law"); *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir.)("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding"), *cert. denied*, 112 S.Ct. 214 (1991).

Instead, federal habeas corpus relief is available on this matter that was adjudicated on its merits only if it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Vaughn argues that the interpretation of this statute by the state courts makes the statute void for vagueness by failing to give fair notice of the conduct that is prohibited. (Pet. at 4-8.) Vaughn also asserts that such expansive and revisionist judicial interpretation of the remuneration aggravator is unconstitutionally vague by failing to properly limit the class of death-eligible persons and properly channel the sentencer's discretion as applied to him. (Pet. at 9-17.) However, Vaughn has pointed to no settled Supreme Court authority to support these contentions, and the Fifth Circuit Court of Appeals has rejected these same types of claims in *Beets v. Johnson*, 180 F.3d 190, 192-195 (5th Cir. 1999)(holding that the term "remuneration" in this penal statute gave fair warning that murder for the proceeds of a life-insurance policy constitutes capital murder, and that this aggravator "establishes a genuine limit on the class of death-eligible murderers"). Therefore, these claims are without merit and should be denied.

**B.  Insufficient Evidence of Guilt.**

In his second claim for relief, Vaughn contends that the evidence is insufficient to sustain a conviction. For the reasons set forth below, this claim should be denied.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979), the Supreme Court held that the proper inquiry on review of the sufficiency of evidence

9

to support a criminal conviction was whether the record evidence could reasonable support a finding

of guilt beyond a reasonable doubt.

> But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS,* 385 U.S., at 282, 87 S.Ct., at 486 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.*, 443 U.S. at 318-19 (Emphasis in original).

In applying this standard,[3] the Texas Court of Appeals at Dallas extensively reviewed the facts

of this case in connection with both a legal and factual sufficiency challenge and observed,

> Appellant's manager saw appellant leave with someone in "a little blue car." One of appellant's neighbors reported seeing appellant and a lady in a blue car. Ultimately, appellant admitted to family that he had seen decedent on the night of her murder although he told decedent's mother that he had not seen decedent. Appellant attempted to have Ooley supply him with a detailed alibi before decedent's body was found. Although appellant wore a Church's Chicken shirt to work, the shirt was not available for a blood analysis.

> Decedent had two to three thousand dollars in her possession when she left Pizza Inn. Neither the Pizza Inn's money nor decedent's purse was found with her body. Appellant did not have a large income. Nevertheless, he lost at least $500 gambling in Shreveport a few days after the murder. Appellant took out a $200,000 life insurance policy on decedent a few days before she was murdered. Appellant was the sole beneficiary named in the policy. Appellant and his attorney received over $37,000 from the insurance proceeds. Although the deceased's mother thought appellant and the deceased were talking about marriage, no one in appellant's family knew of appellant's supposed intention to marry decedent. Rather, he talked to them about marrying Dana Sanders.

> Viewing the above evidence in the light most favorable to the prosecution, any reasonable jury could have found beyond a reasonable doubt that appellant killed the deceased for the insurance proceeds. We resolve appellant's second issue against him.

---

[3] In addition to this "legal sufficiency" analysis, the state court also reviewed the "factual sufficiency" of the evidence in accordance with state law. However, such a "factual sufficiency" review is not cognizable in this proceeding. *See e.g., Pruitt v. Cockrell,* 2001 WL 1115339 at *13-14 (N.D.Tex. Sept.14, 2001), *Ortega v. Dretke,* 2005 WL 1552802 at *2 (N.D.Tex. July 1, 2005).

*Vaughn*, 2000 WL 688249 at *7-8.

In connection with this claim, Vaughn also appears to present a claim of actual innocence. (Pet. at 33-35.)  However, such contention is not accompanied by either legal or factual support. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000).  Therefore, relief is not available on this claim under 28 U.S.C. § 2254(d)(1).  However, even if such a claim were available, Vaughn has not identified the proof capable of making a persuasive showing of actual innocence.[4]

The state appellate court utilized the correct standard of review of the sufficiency of evidence to support his conviction, and Vaughn has neither shown its determinations to be incorrect by clear and convincing evidence, nor that its ultimate resolution of this claim was unreasonable. Accordingly, Petitioner's second claim for relief should be denied.

## C.  Ineffective assistance of trial counsel.

In his third claim for relief, Vaughn contends that his right to the effective assistance of counsel was violated (1) by his failure to call key witnesses, (2) his failure to make sufficient objections at trial and request a continuance, (3) by his failure to subpoena the death certificate of the victim, (4) by his failure to present evidence of a second type of blood at the crime scene, and (5) by a conflict of interest.  (Pet. at 35-45.)  This claim also lacks merit.

---

[4] Vaughn repeatedly suggests that his offer to waive receipt of any proceeds from the life insurance policy on the victim in favor of the victim's mother and child removes the probative value of this evidence and constitutes proof of his innocence. (*See, e.g.,* Pet. at 34.)  However, this court agrees instead with the state court's assessment of this evidence.

11

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel. U.S. CONST. Amend. VI.  The two-pronged standard governing claims of ineffective assistance of counsel in post-conviction habeas proceedings is set forth in *Strickland v. Washington*, 466 U.S. 668, 697-98, 104 S.Ct. 2052, 2070 (1984).  The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient.  *See Strickland*, 104 S.Ct. at 2064.  To prove deficiency, a defendant "must show that counsel's performance fell below an objective standard of reasonableness."  *Id.*  This requires a showing that the errors made by his counsel were so serious that such counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  *See id.*  This court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy.  *See id.* at 2065.  Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight.  *See id.*

The second prong of this test requires the defendant to show prejudice by demonstrating that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *See id.* at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *See id.*  The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one.  *See id.* at 2069.

Vaughn complains that his trial counsel was deficient in failing to call Kent Traylor, the attorney that represented him in the civil proceedings regarding the life insurance policy on the murder victim.  However, It is not clear that this testimony was consistently helpful or would have added meaningfully to Vaughn's defense.

12

Traylor testified in the hearing on Vaughn's motion for new trial that Vaughn initially indicated to him that he wanted all of the insurance proceeds to go to the victim's child, and that it was not until the victim's family "became very strong and vocal" in accusing Vaughn of murder and "basically attempted to have him prosecuted" that he changed his mind.  (RR on MNT at 6.)  "Mr. Vaughn explained to me that if he was going to be accused of murder then he wanted to change his mind on the proceeds."  (RR on MNT at 7.)  However, Traylor later testified that Vaughn wanted the money "because he was unhappy with his court appointed attorney and he wanted to hire counsel." (RR on MNT at 13.)  Traylor testified that at some time Vaughn wanted the entire proceeds (RR on MNT at 10-11), but Traylor also testified that Vaughn communicated an interest in setting aside the majority of the funds for the victim's child, and that "never changed."  (RR on MNT at 12-13.) Traylor said that in the beginning Vaughn wanted the proceeds to go to the child, but later testified that he did not represent him during that period (approximately fifteen to sixteen months) between the time of the murder and the return of the indictment.  (RR on MNT at 10-11.)  The essence of this information was already before the jury.  In fact, it was the prosecutor who brought this out in his own examination of the victim's mother.[5]

---

[5] The prosecutor's examination of the victim's mother included the following exchange:

Q.      When is the first you learned about a life insurance policy?

A.      That morning when he called.

Q.      What happened then?

A.      My niece–well, she told me what he said.

Q.      What did he say?

A.      That me and Richard could have the money.  He didn't want it.

Q.      So he found out she died.  The first thing he thought–he said: You can have the money.

The Dallas Court of Appeals observed in the direct appeal that,

> Both Walker, the insurance agent, and King, a Dallas police officer, testified that appellant initially told them he wanted the money to go to the deceased's son. Traylor's testimony was cumulative as to this issue. The only additional testimony that Taylor (sic) could have supplied was that in spite of appellant's initial offer to give the insurance proceeds to the deceased's son, he never did. This additional testimony would not have changed the outcome of this case.

*Vaughn*, 2000 WL 688249 at *10 (Footnote omitted). Vaughn's trial counsel testified before the state habeas court through an affidavit, which was found to be credible.[6] This affidavit stated that trial

> A.      That's what my niece told me. I was gone to the doctor. I didn't know anything about no money, no insurance and all that kind of stuff.

THE COURT: Ma'am, do me a favor. Say all that over again and speak a little louder. I didn't hear you.

> A.      I didn't know anything about the insurance money. I didn't know anything about no insurance.

BY MR. MOFFITT:

> Q.      That was the first you had learned about the insurance.
>
> A.      That was the first I had learned about it.
>
> Q.      And what had he said about that insurance?
>
> A.      He told her to tell me, I know where he live at if I want to talk to him. And that me and Richard could have the money.
>
> Q.      You and Richard being you and her son.
>
> A.      Could have the money.
>
> Q.      That was on a Monday.
>
> A.      That was on a Monday. It was on my mother's birthday, December the 18th.

(3 RR at 122-124.) That was the same day the victim's body was found. (3 RR at 29-30.)

[6] The state court made the following finding:

Applicant's appointed trial attorney, Richard Carrizales, has executed an affidavit in response to his application affirming that he was trial counsel in this case, which affidavit is attached here to as exhibit A. In his affidavit, Mr. Carrizales acknowledged that he is familiar with applicant's claims, and he denied the truth of those claims. The Court is familiar with Mr. Carrizales, finds that Mr. Carrizales is a credible witness, finds the statements in the affidavit to be worthy of belief, and accepts the statements contained in the affidavit as true and correct.

counsel told Vaughn about concerns in using Traylor as a witness at trial because "we did not want to discuss the fact that Mr. Vaughn was actively trying to obtain the insurance money for the death of the complainant, and Kent Traylor would have had to discuss their efforts to obtain the insurance money." (Carrizales Aff. at 2; St. Hab. Tr. at 157).

"[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy." *Wilkerson v. Cain*, 233 F.3d 886, 892-893 (5th Cir. 2000)(quoting *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir.1983)).  Vaughn has not rebutted by clear and convincing evidence the strong presumption of reasonable trial strategy and therefore has not shown deficient performance in not calling Traylor to testify at his trial.  Further, since Traylor's testimony on this point would have been redundant, no prejudice is shown.

Vaughn also complains that his trial counsel failed to call "Brandi McDonald and Tiffany Bush who would have testified that despite the states (sic) contention that petitioner was hard up for money, that while he was a free man he had the money he needed when he needed it." (Pet. at 39.) This complaint focuses on the adequacy of trial counsel's investigation.  "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003).  Trial counsel testified that "Mr. Vaughn never told me of the existence of Brandi McDonald and Tiffany Bush . . . ." (Carrizales Aff. at 2; St. Hab. Tr. at 157).  Vaughn has not alleged what facts in the possession of his trial counsel would have suggested that such witnesses existed or how they were necessary to his defense.  Therefore, Vaughn has not shown trial counsel's

---

(Finding No. 4, St. Hab. Tr. at 148.)

performance to be deficient in this regard.  Further, the state court found that Vaughn failed to show how the evidence from these witnesses could have changed the outcome of his trial.[7]  Similarly, Vaughn has not made a sufficient showing of prejudice before this court.  Again, Vaughn has satisfied neither prong of *Strickland* on this complaint.

Vaughn also complains of trial counsel's failure to make sufficient objections at trial and request a continuance to review "a stack of papers" an inch to an inch and a half thick that the prosecutors delivered during the trial.  (Pet. at 39.)  Regarding these allegations, Vaughn's trial counsel testified that these papers "were only copies of things I already had and it was not a large stack of papers as [Vaughn] states."  (Carrizales Aff. at 2; St. Hab. Tr. at 157.)  Therefore, trial counsel did not need to object or request a continuance on that basis.  Trial counsel further indicated that in such event he "would have requested a continuance, or at a minimum requested a delay in the trial so that we could have adequate time to review the documents."  (*Id.*)  The state habeas court

---

[7] The Dallas Court of Appeals observed in his direct appeal that,

Appellant claims that the testimony of McDonald and Bush would refute the State's theory that appellant murdered the deceased for monetary gain. Both McDonald and Bush testified at the motion for new trial that they never knew appellant to be in desperate need of money. This testimony would have contradicted appellant's mother's testimony that appellant lived at home with her and never had much money. Appellant does not explain how this testimony could have changed the outcome of this trial.

*Vaughn*, 2000 WL 688249 at *10.

found that trial counsel was not ineffective for failing to take such unnecessary action.[8]  Again, no deficient performance or prejudice is shown.

Vaughn next complains that trial counsel failed to subpoena the death certificate of the victim because of the fact that the time shown on the death certificate might have revealed a time when he would have been able to prove an alibi.  (Pet. at 40.)  This appears to complain of the adequacy of the attorney's investigation.  "To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial."  *Miller v. Dretke*, __ F.3d __, 2005 WL 1785065 at *4 (5th Cir. 2005)(citing *United States v. Green,* 882 F.2d 999, 1003 (5th Cir.1989)).  Rather than state what the death certificate would have revealed, Vaughn's petition states that he "does not know if the death certificate had a time entered or not."  (Pet. at 40.)  This speculation is inadequate to show that such evidence would have benefitted Vaughn's defense and that the failure to obtain such evidence caused prejudice.  This failure of proof was also noted by the state court in denying this ground for relief.[9]

---

[8] The state court made the following finding:

The Court finds that applicant has failed to prove that trial counsel was ineffective in failing to object or request a continuance when the State tendered papers to counsel during trial.  The Court finds that Mr. Carrizales avers in his affidavit that the documents handed to him were not voluminous and were documents he had already seen before trial, so that a continuance was not necessary.  The Court finds that Mr. Carrizales acted within the range of reasonably competent representation when he reviewed the papers and carried on without requesting an unnecessary continuance.  The Court finds that applicant has failed to allege or prove how he was harmed by counsel continuing on with the trial after receiving these papers, and the Court concludes as a matter of law that applicant has therefore failed here to allege a basis for relief.

(Finding No. 6, St. Hab. Tr. at 149.)

[9] The state court made the following finding:

The Court finds that applicant has failed to allege or prove any facts which, if true, would prove that trial counsel was ineffective in not offering the victim's death certificate in evidence.  Although applicant speculates that the death certificate might have shown a time of death consistent with his presence at the scene, the Court finds that applicant has failed to present this Court with either the death certificate or any witnesses' statements which could have provided him an alibi for any time

Therefore, it does not show that the state court decision was "based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[10]

Similarly, Vaughn complains of his trial counsel's failure to produce evidence of a second type of blood at the crime scene, but admits that this evidence has not been shown to exist. (Pet. at 41-42.)  As noted by the Dallas Court of Appeals, Carolyn Van Winkle testified at trial that all of the blood stains from the car and victim's clothes were consistent with the victim's blood.  *See Vaughn*, 2000 WL 688249 at *4; (4 RR at 25).   The state habeas court received evidence from another expert that "there was no genetic evidence that would indicate the presence of a third contributor in addition to [the victim] and/or Carlos Vaughn."  (Sliter aff. at 3; St. Hab. Tr. at 162).  Although Vaughn argues the insincerity of this expert, he produced nothing before this or the state court to show that such evidence of a third contributor exists.  Therefore, he has not shown deficient performance or prejudice.

Vaughn concludes these group of complaints by claiming that his trial counsel had an active conflict of interest.  Vaughn states that he "and his family not only complained to Carrizales when they happened to reach him, but petitioner cursed him just about every time they talked."  (Pet. at 43.) His trial counsel denied this, and the state habeas court found trial counsel's statements that "there

---

stated on the certificate.  In addition, the Court notes that the statute relief upon by applicant, Tex. Code Crim. Proc. art. 38.22, only provides a rebuttable presumption–and only if a time of death has been entered on the certificate by a licensed physician–but applicant has failed either to allege or prove that any specific time was noted on the certificate, that the medical examiner's testimony set out a different time, or that the medical examiner's testimony was insufficient to rebut the statutory presumption in the events that the testimony was different than the recitations on the certificate.  The Court finds that applicant has failed to allege or prove that admission of the certificate would actually have been necessary or beneficial to applicant, and he has therefore failed to prove that its omission by trial counsel constituted ineffective assistance, or that he was harmed by counsel's actions.

(Finding No. 8, St. Hab. Tr. at 150.)

[10] Further factual development before this court is also foreclosed due to this failure. 28 U.S.C. § 2254(e)(2).

was no actual conflict of interest or any hostility which might have deprived [Vaughn] of effective representation of counsel" to be "worthy of belief, and the Court finds that [Vaughn] has failed to prove that any conflict of interest existed sufficient to undermine his right to effective assistance of counsel." (Finding No. 10; St. Hab. Tr. at 151-152). Vaughn's allegations show that he may well have been a difficult client, but this does not suffice to establish a conflict of interest constituting ineffective assistance under the Sixth Amendment.

The Constitution does not guarantee a meaningful attorney-client relationship. *See Morris v. Slappy*, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983). The guarantee of effective assistance of counsel does not depend upon a client's satisfaction, but upon the performance of his counsel. *See United States v. Cronic*, 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984) ("the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such"). Vaughn is not entitled to relief from his conviction and a determination that his counsel was deficient merely because he was not happy with his counsel, or because his personal relationship with counsel may have been strained. This complaint is also without merit and should be denied.

All of Vaughn's claims of ineffective assistance of trial counsel are without merit and should be denied.

## D.  Ineffective assistance of appellate counsel.

In his fourth claim for relief, Petitioner contends that he was deprived of the effective assistance of counsel in his direct appeal. (Pet. at 45-48.) This claim also lacks merit.

Appellate counsel's performance on appeal is judged under the same two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674

19

(1984).  *See Smith v. Robbins*, 528 U.S. 259, 286, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000); *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).  In the first prong, a petitioner must show that the performance of his appellate counsel was deficient in an objectively unreasonable manner. *Robbins*, 120 S.Ct. at 764.  Further, "[t]he Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal." *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.), *cert. denied*, 110 S.Ct. 419 (1989).  Instead, appellate counsel should winnow out "weaker arguments on appeal" and focus on "one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52,  103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983)(holding that judges should not second-guess reasonable professional judgments and impose a duty on appointed counsel to raise every colorable claim suggested by a client).  Regarding the prejudice prong, a habeas petitioner must at least "show a reasonable probability that, but for his counsel's unreasonable failure . . . he would have prevailed on his appeal." *Briseno*, 274 F.3d at 207 (citing *Smith*, 528 U.S. at 285, 120 S.Ct. at 764).  Again, the court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Strickland*, 104 S.Ct. at 2069.  Under this standard, petitioner's complaints must be denied.

In this claim, Vaughn again asserts the failure of his counsel to present evidence of blood at the crime scene from a person other than either the victim or Vaughn.  However, as discussed above in the analysis of his complaints against trial counsel, Vaughn has not yet shown that such evidence exists.  *See supra* at p. 18.  Therefore, even if his appellate counsel could have been expected to develop evidence outside of the record on appeal, Vaughn has failed to show the necessity or even benefit of such an effort.  Accordingly, this claim should be denied.

Vaughn also contends that his appeal counsel was ineffective for failing to properly present the claims that his conviction was based on an improper application of the statute proscribing murder for remuneration or the promise of remuneration.  (Pet. at 46-48.)  As stated above, the statute, Section 19.03(a)(3) of the Texas Penal Code, properly includes murder for insurance proceeds, *see supra* at pp. 8-9, and the evidence admitted at Vaughn's trial is sufficient to sustain his conviction on this basis.  *See supra* at pp. 9-11.  Therefore, Vaughn has not shown that his appellate counsel failed to do anything that would have made a difference in his direct appeal.

Vaughn has not shown that the performance of his appellate counsel was deficient, or that any prejudice resulted.  Accordingly, these claims should be denied.

## E.  Unfair tribunal.

In his fifth and final claim for relief, Vaughn contends that he was deprived of an impartial and fair trial judge.  (Pet. at 48-49.)  This claim also lacks merit.

The Due Process Clause requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case.  *See Bracy v. Gramley*, 520 U.S. 899, 905, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97(1997).  As the Fifth Circuit Court of Appeals recently stated,

> We note that the United States Supreme Court has consistently enforced the basic right to due process and found that decision makers are constitutionally unacceptable when:  (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case;  (2) an adjudicator has been the target of personal abuse or criticism from the party before him;  and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.  *Id.* To demonstrate such a due process violation and secure relief based thereon, [the habeas petitioner] was required to establish that a genuine question exists concerning [the trial judge's] impartiality.  *See Liteky v. United States,* 510 U.S. 540, 552, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).  Moreover, adjudication before a biased trial judge falls within the "very limited class of cases" that represents a "structural" error

21

subject to automatic reversal. *Neder v. United States,* 527 U.S. 1, 7-8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)

*Bigby v. Dretke*, 402 F.3d 551, 558-559 (5th. Cir. 2005), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Jul. 15, 2005)(No. 05-5390) (footnotes omitted).

Vaughn's claim does not fit easily into any of these categories.  He does not claim that the trial judge had any personal interest in the case, nor does he contend that the trial judge had a dual role in the trial.  Vaughn does not claim that the judge was the target of any personal abuse from Vaughn, or any criticism from Vaughn outside of what is revealed in the record.  During the proceedings on his motion for a new trial, Vaughn called himself as a witness and testified that his attorney's performance was deficient and that the prosecution did not prove its case.  The trial judge asked his own questions of Vaughn, specifically calling Vaughn's attention to the testimony of his brother's fiancé regarding Vaughn's attempt to create an alibi for the murder before the body was even found.  It is this exchange on the record that Vaughn claims to show that the trial judge was biased against him by construing the end of the exchange as an admission by the judge that the evidence was insufficient, as follows:

THE COURT:          Did you hear that?

THE DEFENDANT:  Yes, sir.  If I was able to get on the state I could have - -

THE COURT:          - - said she was not telling the truth?

THE DEFENDANT:  No, I would have agreed with some things.

THE COURT:          Let's not go into that.  You don't need to be telling me that, but I'm just - - You said you didn't hear any evidence.  You heard that, didn't you?

THE DEFENDANT:  I heard that.

THE COURT:          Okay.

22

THE DEFENDANT:  But does that prove that I killed somebody?

THE COURT:          No.  The jury thought so.

(RR on MNT at 28.)  Regardless of the trial judge's meaning in this exchange, he obviously did not find the evidence insufficient to sustain the conviction.  Clearly, this is not the kind of criticism of a trial judge by a defendant that would create a bias against him and render further proceedings unfair, particularly in light of the fact that the exchange occurred after the trial and appears calculated to obtain Vaughn's explanation of evidence that the trial judge considered important proof of guilt in connection with Vaughn's attack on his conviction.  This claim lacks merit and should be denied.


## IX.
## CONCLUSION AND RECOMMENDATION.

Petitioner has failed to make a substantial showing of the denial of a federal right.  The state court adjudication on the merits neither resulted in a decision that was contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  For each of the reasons set out above, Petitioner's petition for a writ of habeas corpus should be DENIED.


## X.
## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT.

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must

specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  Failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

IT IS SO RECOMMENDED.

ENTERED August 17, 2005.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE